IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| STEPHANIE SMITH, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | CASE NO.: 2:06 CV59-C |
| | * | |
| CITY OF MONTGOMERY, | * | |
| | * | |
| Defendant. | * | |

## BRIEF IN OPPOSITION TO
## THE DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT

### FACTS

The Plaintiff, Stephanie Smith, was employed with the City of Montgomery as a Labor Foreman I. Her immediate supervisor was Billy Sexton (Transcript of Montgomery City-County Personnel Board Hearing, Exhibit 6, hereinafter "Transcript", p. 7). On April 23, 2003, the Plaintiff drove her truck into the City lot for her lunch break and the lunch break of her two (2) crew members. The Plaintiff was the only female foreman and there were also no female laborers in that section of the Maintenance Department (Transcript, p. 112; See Smith Affidavit, Exhibit 1).

There was an area within the Maintenance Department referred to as the "bull room", where the employees would spend their lunch time. This was an all male area, so the Plaintiff would always spend her lunch time in her truck. The language in th all male "bull room" was rough and it was not a comfortable area for a woman. Employees of the City, while on their lunch break, would sleep in the "bull room" or in their trucks. It was not a violation of City of Montgomery Policy for an employee of the City to sleep in their tuck or in the "bull room" while

on their lunch break, which was from 12:00 - 12:30 (Transcript, p. 20, 21, 51, 62, 77, 78, 112, 143, 144).

On April 23, 2003, as was the common practice for the Plaintiff, she advised her two (2) crew members that they were to leave the "bull room" and come to the truck by 12:30, so that they could get back in service. The Plaintiff had a child that suffered from medical conditions that caused the Plaintiff to often be up with her at night and so the Plaintiff normally used her thirty (30) minutes at lunch to take a nap (Transcript, p. 97, 108, 114, 142).

On this occasion, the Plaintiff's supervisor, Billy Sexton, instructed her laborers not to go back to the truck at 12:30. This contradicted the instructions given to them by the Plaintiff, who was their immediate supervisor. Roderick Chambers testified that between 12:00 and 12:30, which was the lunch break Billy Sexton came to him and told him to tell Stephanie to go to Sherman Pipe and pick up an order, Chambers forgot what he told him and went back to ask what it was. This was still before 12:30, the end of lunch. Sexton asked him where Stephanie was and he said in the truck. Sexton then asked was she asleep and he said he did not know. Sexton then told him to wait until 12:30 and see if she comes into the office (Transcript, p. 92, 95). Mr. Chambers himself had previously been charged with sleeping on the job before, but not terminated (Transcript, p. 94). Mr. Chambers was, at the time of his testimony, in charge of the truck that had previously been Stephanie Smith's (Transcript, p. 90).

Mark Singleton testified that he was in the Plaintiff's crew and that on an occasion Billy Sexton stopped him and told him not to go back to the truck as his foreman, Stephanie Smith, had instructed him. Mark Singleton testified that employees sleep in the "bull room" during their lunch break and that the foremen either go in the "bull room" or go somewhere to lunch. He testified that there were no women in the "bull room" and that Stephanie Smith, his foreman and

supervisor, had complained to him that she did not like hanging around in the "bull room" because of the rough language. He further stated that the "bull room" was not the kind of place that a woman would want to be "hanging out" (Transcript, p. 112).

Mark Singleton testified that there was an occasion, before his lunch break was up, that Billy Sexton came to him and told him not to go back to the truck where his foreman, Stephanie Smith, was waiting. Singleton stated that he went over to the office of Stephanie Smith's husband, Danny Smith, because he had been instructed not to go to the truck. His reason for going to Danny Smith's office was to let him know, so that he could call Stephanie or find some way to wake her up, "because I wasn't allowed to." He stated that Sexton was not letting him go back to the truck when 12:30 hit. He stated that Sexton came to get him when he went over to Danny Smith's office. Danny Smith worked in the office with a City of Montgomery Police Officer named Lieutenant Kenny and Singleton had already told Kenny what Sexton was doing in refusing to let him go to the truck when Sexton came and told him to go back to the "bull room". He stated that Billy Sexton and Tom Provitt went out to the truck after 12:30 to try to catch the Plaintiff, Stephanie Smith, asleep because he had not been allowed to do as he was instructed, to come back to the truck at the end of the lunch break (Transcript, p. 111-114). Singleton testified that the normal thing to do when they came back to the City lot at lunch, was for him to go in the "bull room" and his foreman, Stephanie Smith, to stay in the truck. He was told to come out at 12:30 and then they would leave to go back on the job (Transcript, p. 114).

Sexton instructed the Plaintiff's employees not to do what she had instructed them in coming out to the truck so that they could leave, and he charged her with sleeping on the job and taking an excessive lunch break. He recommended her dismissal.

The Plaintiff's immediate supervisor, Billy Sexton, had previously made a statement that he would never hire another woman, in discussing the Plaintiff. He had also admitted that other foreman under his supervision slept between 12:00 and 12:30 without any adverse consequences (Transcript, p. 20 21, 92, 94, 113). Prior to her termination becoming official, the Assistant Maintenance Director, Gail Gibson, Department Head and Director of Maintenance, Jim Wilder, and the Mayor's Executive Hearing Officer, Larry Armstead, had each been made aware through documentation and witnesses that Sexton had said he would not have another woman working for him (Exhibit 2; Transcript, p. 64, 65).

A recommendation of termination, although instigated by Billy Sexton, was officially made by the Department Head of the Maintenance Department, Jim Wilder, and the decision to terminate or not was with the Mayor, Bobby Bright. On June 3, 2003, Mayor Bright terminated Stephanie Smith. This became official upon the Personnel Director, Barbara Montoya, signing off on June 4, 2003. There was no adverse employment action taken against her until she was terminated on June 4, 2003 (See Exhibit 3).

Stephanie Smith appealed the termination to the Montgomery City-County Personnel Board. There was a hearing and she was notified on November 12 that her termination was upheld by the Board. She then filed a charge with the Equal Employment Opportunity Commission for employment discrimination on November 21, 2003. The charge of discrimination was received on November 25, 2003, which was less than one hundred and eighty (180) days from the adverse employment action taken against her on June 4, 2003.

## ARGUMENT

The Defendant, City of Montgomery, would like to have it both ways, inconsistently arguing that the Plaintiff failed to timely exhaust administrative remedies, claiming that the Plaintiff failed to file her administrative charge with the Equal Employment Opportunity Commission within one hundred and eighty (180) days from the adverse employment action taken against her. The City contends that the time for filing should have either begun to run when the supervisor recommended her to his department head for termination or stating that at the latest, at the time when the Mayor of the City of Montgomery, Bobby Bright, through his administrative assistant advised the Plaintiff's Department Head, James D. Wilder, to "Prepare the necessary personnel forms and forward to this office for approval (See Exhibit 4)."

The Defendant then inconsistently argues at page 18 of its Brief, "Finally, the City of Montgomery cannot be held liable for the termination of Smith because Mayor Bright and the City of Montgomery were not the final policy making authority...nonetheless, Smith had the right to appeal his (*sic*) decision to the Montgomery City-County Personnel Board. It is a separate entity from the City of Montgomery. Smith made that appeal. A full evidentiary hearing was held on November 10, 2003, the Personnel Board upheld the recommended termination."

On the one hand, the City argues that the Plaintiff's charge to the Equal Employment Opportunity Commission was untimely because it was filed on November 25 and the Mayor made a determination to fire Smith on May 23. On the other hand, the City of Montgomery says the Mayor really did not make the decision, but it was the Personnel Board and the decision was made on November 10, 2003.

The City of Montgomery's argument fails on both counts because the Mayor actually signed a recommendation for personnel action on June 3, 2003, and it was approved by the

Personnel Director on June 4, 2003 (See Exhibit 3). Therefore, the Plaintiff's charge with the Equal Employment Opportunity Commission was timely filed within one hundred and seventy-four (174) days of the adverse employment action. If the contention of the City of Montgomery is that the Mayor of the City of Montgomery was not the final policy maker for the termination of the Plaintiff, but rather the Montgomery City-County Personnel Board was, then the charge of discrimination would have been filed within thirteen (13) days. The Mayor is the sole individual with the authority to terminate City employees (See Section 4.06 (2) of Act 608 of the 1975 regular session of the Alabama Legislature, Exhibit 5).

In the case of *Wright v. Amsouth* 320 F.3d 1198 (11th Cir. 2003), in making a determination concerning when the time begins to run for compliance with the filing of a charge of discrimination within one hundred and eighty (180) days of the adverse employment action, the 11th Circuit set forth, "The key determination then is when Wright received unequivocal notice of his termination." The *Wright* Court quoting *Stewart v. Booker T. Washington Insurance* 232 F.3d 844, 849 (11th Cir. 2000) stated, "We have also said a Plaintiff must be told that she is actually being terminated before the one hundred and eighty (180) day filing period begins to run, not that she might be terminated if future contingencies occur. Beginning the charge filing period any earlier would make little sense to require a Plaintiff to file a discriminatory termination charge with the Equal Employment Opportunity Commission prior to the receipt of notice of termination would be to require filing prior to the occurrence of the discriminatory conduct, thereby charging the Equal Employment Opportunity Commission with responsibility for the arguably advisory task of investigating a hypothetical case of discrimination."

Page 2 of document 9 filed by the City of Montgomery is the Personnel Department Recommendation for Personnel Action pertaining to the Plaintiff, Stephanie Smith (See Exhibit

3). It is marked that the document pertains to her dismissal. Number 5 "dismissal" is check-marked. Right before the check marks, there is an explanation that states, "Item 2, 3, 4, 5, 6, and 15 require approval of Personnel Director before action is official." The document is signed by Bobby N. Bright and dated June 3, 2003, right under the statement terminated due to Mayor's decision. The document is also signed by Barbara M. Montoya, the Personnel Director on June 4, 2003. Based upon the document itself, submitted by the City of Montgomery in support of its Motion for Summary Judgement within the personnel file of the Plaintiff, the Plaintiff's termination was not official until June 4, 2003. Therefore, the Plaintiff could not have unequivocal notice of the official action until that date or later.

Page 3 of document 9 is a memorandum from Larry Armstead, the Executive Assistant to the Mayor, to James D. Wilder, the Maintenance Department Director (See Exhibit 4). It is dated May 23, 2003. It requests that the Department Head prepare the forms to be sent to the Personnel Director to accomplish the termination of the Plaintiff. The prepared form is Exhibit 3. The Plaintiff's charge of discrimination was timely filed and was determined to be timely filed by the Equal Employment Opportunity Commission.

In *Wright v. Amsouth Supra*, the Court held that a genuine issue of material fact existed about whether Wright filed his charge of discrimination in one hundred and eighty (180) days of receiving notice of his termination and that the Trial Court should not have granted Summary Judgement in favor of the Defendant, Amsouth, because there was a disputed question of fact as to the timeliness of the charge. In the document submitted by the City of Montgomery, it is obvious that the Plaintiff could not have had unequivocal notice of her termination until after June 4, 2003. Therefore, at least a jury question exists.

The 11th Circuit determined in the case of *Grayson v. K-Mart Corporation* 79 F.3d 1086, 1100 n.19 (11th Cir. 1996) that the starting point for the one hundred and eighty (180) day filing period depended upon the date of unequivocal communication of the adverse employment decision. The adverse employment decision in this case is not the Line Supervisor's recommendation of termination to his Department Head or the Department Head's recommendation to the Mayor, but rather is the Plaintiff's termination by the Mayor, which became official on June 4, 2003.

It is not necessary for the Plaintiff in this case to meet the standard set forth in *McDonald Douglas Corporation v. Green* 411 US 79293 s.ct.1817, 36 l.Ed. 2d 668 (1973), as there is direct evidence of discrimination here. The Plaintiff's immediate supervisor, who developed the facts, set forth the charges against her, and recommended up through the chain-of-command her termination, stated in reference to the Plaintiff that he would never hire another woman or have another woman working for him. The actual statements were disputed, in that witnesses stated that he said, "If he ever got rid of Stephanie, he would never hire another woman." Sexton, the supervisor, testified in the Plaintiff's Montgomery City-County Personnel Board Hearing, "I said, if I had another woman, I wouldn't have one working for me (Transcript, p. 20)." Joe Orr, an employee of the City Maintenance Department, testified in the Personnel Board Hearing that he was in the maintenance supervisor's office area and there were several other people there and he heard the Plaintiff's supervisor, Billy Sexton, say he would never hire another woman (Transcript, p. 104).

Larry Armstead, the Executive Assistant to the Mayor, who acted as the Mayor's hearing officer on the Plaintiff's appeal to the Mayor, testified that he did not see in the paperwork that Billy Sexton had said he would not hire another woman or have another woman working for him.

Armstead said that if he had noticed that, he would have investigated it as sexual discrimination (Transcript, p. 88, 89). That contention was before him in the documentation (See Exhibit 2).

In the case of *Wright v. Southland Corporation* 187 F.3d 1287 (11th Cir. 1999), the 11th Circuit went into great detail describing how direct evidence was to be defined and its effect on a discrimination case. In that case, the 11th Circuit found that direct evidence should be defined as "Evidence from which a reasonable tryer of fact could find more probably than not a causal link between an adverse employment action and a protected personal characteristic." Here Sexton recommended the Plaintiff for suspensions for taking lunch at a time other than 12:00 and for termination for being five (5) minutes late. He recommended her for termination for an excessive lunch break when he would not let her workers go to the truck. He set up a case against her while saying he would not have another woman work for him. These statements are evidence for which a reasonable tryer of fact could find more probably than not a causal link between her termination and her sex, female.

The Plaintiff in this case was terminated on June 4, 2003. Her termination was based upon evidence compiled and presented on charges created by Billy Sexton, her immediate supervisor. Sexton had made the statement in reference to the Plaintiff, that he would never hire another woman or never have one working for him. This statement, from the man who entrapped the Plaintiff and compiled the case against her, is direct evidence of discrimination.

The Plaintiff also, although not necessary where there is direct evidence of discrimination, has evidence to establish the *McDonald Douglas Standard.*

It is undisputed that an adverse employment action was taken against her, as she was terminated. She was qualified for the job she was doing, as the Maintenance Director, James Wilder, testified, "She did a good job. She was a hard worker (Transcript, p. 102, 103)."

Different treatment was given to male employees similarly situated to her. Billy Sexton testified that other foreman (all are males) sleep between 12:00 and 12:30 (Transcript, p. 21). No one else had ever been terminated for taking an excessive lunch break (See *Wright v. Southland Supra*).

It is undisputed that male employees of the Maintenance Department and those under the supervision of Billy Sexton were allowed to sleep on their lunch break. They are off the clock at that time. It is their time to do with as they wish (Transcript, p. 77, 78). Sexton admitted that he has had other foreman who were asleep between 12:00 and 12:30 (Transcript, p. 21). In an effort to entrap the Plaintiff, Billy Sexton told her crew members not to follow her instructions, which were to come back and get her at 12:30 so that they could go back on the job, so that he could allow her to sleep past 12:30 and recommend her dismissal.

## CONCLUSION

The Plaintiff filed a timely charge with the Equal Employment Opportunity Commission. There was direct evidence of discrimination and the Plaintiff, although qualified for the job she held, was terminated and replaced with a male employee. The reasons given by the City of Montgomery were a pretext for discrimination.

J. BERNARD BRANNAN, JR.(BRA022)
Attorney for Petitioner

OF COUNSEL:
THE BRANNAN LAW FIRM, P.C.
Post Office Box 307
Montgomery, AL 36101
(334) 264-8118

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing on the following counsel of record, by hand delivery on this the __13th__ day of February, 2007:

Kimberly O. Fehl
City of Montgomery
Legal Division
Post Office Box 1111
Montgomery, Alabama 36101-1111

_____
OF COUNSEL